UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

CATALINA BORRERO,                        :

                Plaintiff,               :

        - against -                      :

AMERICAN EXPRESS BANK LTD.,              :

                Defendant.               :

- - - - - - - - - - - - - - - - -x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED: 2/5/2008             │
└─────────────────────────────────┘
```

**OPINION**

05 Civ. 10801 (DC)

**APPEARANCES:**     LIDDLE & ROBINSON, LLP
                    Attorneys for Plaintiff
                         By:  Christine A. Palmieri, Esq.
                    800 Third Avenue
                    New York, New York  10022

                    KELLEY DRYE & WARREN LLP
                    Attorneys for Defendants
                         By:  Jean Young Park, Esq.
                              John E. Kiley, Esq.
                    101 Park Avenue
                    New York, New York  10178

**CHIN, D.J.**

        In this case, plaintiff Catalina Borrero alleges that

her former employer, defendant American Express Bank, Ltd.

("AEB"), discriminated against her on the basis of gender and

retaliated against her when she complained of disparate

treatment.  She sues under federal, state, and city law.

        AEB moves for summary judgment pursuant to Federal Rule

of Civil Procedure 56.  For the reasons that follow, the motion

is granted in part and denied in part.

## BACKGROUND

### A.    The Facts

        The facts are drawn from the pleadings, affidavits,

depositions, and the parties' Rule 56.1 statements.  For purposes

of this motion, the facts are construed in the light most favorable to Borrero as the party opposing summary judgment, and conflicts in the evidence have been resolved in her favor.

### 1. **Borrero's Employment at AEB**

Borrero is a former AEB employee who worked in its New York Financial Market Services ("FMS") group from March 11, 2002, when she was hired, to April 7, 2005, when she resigned. (Def. 56.1 ¶ 9).[1] During her employment at AEB, Borrero had at least three different supervisors. Victor Polce was head of the New York FMS group and Borrero's immediate supervisor until March 2004, when he left AEB. (Id. ¶ 6). Matthew Porio was Borrero's interim supervisor between March 2004 and June 2004 (id. ¶ 7), when Alan Circle was hired to lead the New York FMS group (id. ¶ 8).

### 2. **Disparate Treatment at AEB**

Borrero brings sex discrimination claims against AEB for the disparate treatment she received while under Polce and Circle's supervision. In short, (1) Polce allocated internal accounts, which generate revenue more easily than external accounts, to male employees (Park Aff., Ex. J at 21)[2], (2) when one of the internal accounts, the International Payments account, was later transferred to Borrero, Circle "made sure" that the

---

[1]     "Def. 56.1" refers to AEB's Rule 56.1 Statement, which is cited only where Borrero does not dispute the fact.

[2]     Exhibit J of the Park Affirmation contains the transcript of Borrero's June 19, 2007 deposition.

revenue from that account was not counted toward her sales quota, even though another New York FMS employee, Brett Glenn, had received credit for the revenue when he was responsible for the account (Borrero Aff. ¶ 13), (3) Polce failed to promote Borrero at the end of 2003, even though he had promised that he would promote her if she achieved her sales quota, which she did (id. ¶ 10), (4) Polce and Circle told only women in the trading room to "calm down" (id. at ¶ 11), (5) Circle did not allow Borrero to leave for a meeting in midtown and commented that "this is not a social club," yet allowed another New York FMS employee, Michael McGuinness, to leave early for a baseball game (Circle Dep. at 79), (6) Circle chastised Borrero for mistakes she did not make, and never apologized when he later discovered that she had not made any mistakes (Borrero Aff. ¶ 14), (7) Circle excluded Borrero from client meetings (Palmieri Aff., Ex. 24), (8) Circle did not grant Borrero's request to travel to Peru for business (Borrero Aff. ¶ 15), and (9) Borrero received lower bonuses and less restricted stock awards ("RSAs") than five male employees who also worked in the New York FMS group (Def. 56.1 ¶¶ 55, 63, 66).  These comparators are Flavio Paparella, Richard Savage, Fabio Gomez, Brett Glenn, and Michael McGuinness.

### 3.  Complaints to AEB Human Resources and Subsequent Retaliation

On October 5, 2004, Borrero filed a complaint with AEB's Human Resources department, alleging that Circle was creating a hostile work environment on the basis of gender.

(Def. 56.1 ¶ 99). In response to the complaint, AEB's Employee Relations Group (the "ERG") conducted an investigation and subsequently informed Circle that there was no merit to the complaint. (Id. ¶ 100).

In February 2005, Borrero filed another complaint with the ERG, alleging that Circle had retaliated against her for filing the October 2004 complaint. (Palmieri Aff., Ex. 7). After Borrero filed the February 2005 complaint, Circle retaliated again by (1) denying Borrero's request to travel to Peru (Borrero Aff. ¶ 15), (2) keeping records of her performance that would "pav[e] the way for her poor performance review" (Pl. Mem. at 15, citing Palmieri Exs. 12-14), (3) giving Borrero a low performance review in 2004, which as a result, placed Borrero on a 45-day performance improvement plan (the "PIP") (Def. 56.1 ¶ 104), (4) not informing Borrero that he was "planning to visit [her] main client in Brazil" without her (Palmieri Aff., Ex. 24), and (5) cancelling Borrero's access to Bloomberg Terminal ("Bloomberg") and not restoring it by the time she resigned on April 7, 2005 (Borrero Aff. ¶ 18).

### 4. Borrero's Resignation

On April 7, 2005, Borrero submitted a letter of resignation stating that "[r]ecent events . . . have made [her] working conditions so intolerable that they have resulted in [her] constructive discharge." (Palmieri Aff., Ex. 29). In the letter, she also expressed her belief that Circle intended to terminate her employment at the conclusion of her PIP and cited

-4-

several bases for that belief. In addition to the meetings he
scheduled with her clients without her knowledge and the
cancellation of her Bloomberg subscription, Marikit Salcedo, a
Human Resources employee, informed her that her PIP "was not
working" and that AEB "would have to fire" her thirty days after
the conclusion of her PIP. (Id. at Exs. 25, 30). Moreover,
seven days before her PIP was to end, Borrero heard Circle
singing "it's the final countdown" and "seven days, seven days
until April 4," which she construed as Circle's anticipation of
the conclusion of her PIP and her employment. (Park Aff., Ex. F
at 239).[3]

## B.  **Prior Proceedings**

Borrero filed a charge of discrimination with the Equal
Employment Opportunity Commission (the "EEOC") on March 7, 2005,
alleging retaliation and discrimination based on sex. (Compl.
Ex. A). Borrero received a right to sue letter from the EEOC on
September 29, 2005 (Compl. ¶ 8), and commenced this action on
December 27, 2005.

In her complaint, Borrero asserts eight claims: "sex
discrimination" in violation of Title VII of the Civil Rights Act
of 1964 ("Title VII"), the New York State Human Rights Law (the
"State Human Rights Law"), and the New York City Human Rights Law
(the "City Human Rights Law") (respectively, the first, second,
and third claims); "sex discrimination" in violation of the

---

[3]     Exhibit F of the Park Affirmation contains the
transcript of Borrero's June 26, 2007 deposition.

federal Equal Pay Act (the "EPA") and the New York State Equal Pay Law (the "State EPL") (respectively, the fourth and fifth claims); and retaliation in violation of Title VII, the State Human Rights Law, and the City Human Rights Law (respectively, the sixth, seventh, and eighth claims).  On October 2, 2007, AEB filed this motion for summary judgment.

**DISCUSSION**

## A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  Summary judgment is inappropriate if the Court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party."    <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

A court must be "especially cautious" in deciding a motion for summary judgment in a discrimination case because "the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting inference of discrimination."  <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999).

**B.   Disparate Treatment Claims**

As an initial matter, AEB argues that many of Borrero's claims under Title VII are time-barred.  I discuss this procedural barrier before proceeding with the merits of Borrero's disparate treatment claims under Title VII and the EPA.  Finally, I address analogous city and state law claims separately.

**1.   Statute of Limitations Under Title VII**

Under Title VII, the statute of limitations for filing a charge of discrimination in states such as New York that have an agency with the authority to address charges of discriminatory employment practices is 300 days.  42 U.S.C. § 2000e-5(e)(1). Failure to file a timely charge of discrimination with the EEOC renders a claim time-barred.  Williams v. Bd. of Educ., 972 F. Supp. 248, 249 (S.D.N.Y. 1997).

The time for filing a charge of employment discrimination begins when the discriminatory act occurs.  The Supreme Court has held that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," and so a charge must be filed within the statutory time period after the discrete discriminatory act occurs.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  Hence, "only incidents that took place within the timely filing period are actionable."  Id. In a recent case involving an unequal pay claim under Title VII, the Supreme Court reaffirmed this principle and further held that "a new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past

discrimination." Ledbetter v. Goodyear Tire & Rubber Co., Inc.,
127 S. Ct. 2162, 2169 (2007) (rejecting petitioner's "effort to
circumvent the need to prove discriminatory intent during the
charging period" by "rel[ying] on the intent associated with
other decisions made by other persons at other times").

Here, AEB argues that all alleged acts of
discrimination that occurred more than 300 days before March 7,
2005, when Borrero filed her charge with the EEOC, are untimely
and, therefore, unactionable. Borrero does not argue that the
"continuing violation" doctrine, which saves otherwise time-
barred discriminatory acts, applies here. See Pearson v. Bd. of
Educ., 499 F. Supp. 2d 575, 590 (S.D.N.Y. 2007). Indeed, she
does not respond to AEB's statute of limitations argument at all.
Accordingly, this prong of AEB's motion is granted and alleged
acts of disparate treatment that occurred more than 300 days
before Borrero filed her discrimination charge are not
actionable. As a result, Borrero may recover under Title VII
only for those acts that occurred after May 12, 2004. In effect,
all claims of discrimination based on Polce's alleged conduct are
time-barred, as he was Borrero's supervisor only until March
2004; hence, only the claims based on the actions of Circle, who
became Borrero's supervisor on June 21, 2004, remain. The time-
barred acts, however, may still serve as background evidence, and
the jury will be instructed accordingly.

2.   **Title VII Claims**

     a.   **Applicable Law**

     The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000); Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities, 115 F.3d 116, 119 (2d Cir. 1997).

     In the absence of direct evidence of discrimination, courts apply the burden-shifting framework for federal discrimination claims set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and a plaintiff in an employment discrimination case usually relies on the three-step McDonnell Douglas test.  First, she must establish a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination.  See McDonnell Douglas, 411 U.S. at 802, 802 n.13 (noting that elements of prima facie case vary depending on factual circumstances); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997) (in age discrimination case, discussing reformulation of McDonnell Douglas framework).

     An adverse employment action is a "materially adverse change in the terms and conditions of employment." Galabya v.

N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)
(internal quotation omitted).  "'To be materially adverse' a
change in working conditions must be 'more disruptive than a mere
inconvenience or an alteration of job responsibilities.'"  Id.
(quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132,
136 (7th Cir. 1993)).  An adverse employment action is not
defined "solely in terms of job termination or reduced wages and
benefits[.] . . . [L]ess flagrant reprisals by employers may
indeed be adverse." Wanamaker v. Columbian Rope Co., 108 F.3d
462, 466 (2d Cir. 1997).  A materially adverse change may be
indicated by a termination of employment; a demotion with a
decrease in wage or salary or a less distinguished title; a
material loss of benefits; significantly diminished material
responsibilities; or other indices unique to a particular
situation.  Galabya, 202 F.3d at 640; see Johnson v. Eastchester
Union Free Sch. Dist., 211 F. Supp. 2d 514, 517-18 (S.D.N.Y.
2002).  There are no bright-line rules in applying this standard.
Johnson, 211 F. Supp. 2d at 518.  "Whether a particular
reassignment is materially adverse depends upon the circumstances
of the particular case, and should be judged from the perspective
of a reasonable person in the plaintiff's position, considering
all the circumstances." Burlington N. & Santa Fe Ry. Co. v.
White, 126 S. Ct. 2405, 2417 (2006) (quotations omitted).

        If the plaintiff establishes a prima facie case of
unlawful discrimination, "a rebuttable presumption of
discrimination arises and the burden then shifts to the defendant

to articulate a legitimate, nondiscriminatory reason for the employment decision." <u>Stratton</u>, 132 F.3d at 879; <u>see</u> <u>Reeves</u>, 530 U.S. at 142-43.

If the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11 (1993) (citation omitted); <u>see</u> <u>James v. N.Y. Racing Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. <u>See</u> <u>Fields</u>, 115 F.3d at 120-21; <u>Connell v. Consol. Edison Co.</u>, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish her <u>prima facie</u> case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 99-101 (2003); <u>Harris v. City of New York</u>, No. 03 Civ. 6167 (DLC), 2004 WL 2943101, at *2 (S.D.N.Y. Dec. 21, 2004). It is not sufficient, however, for a plaintiff merely to show that she satisfies "<u>McDonnell Douglas</u>'s minimal requirements of a <u>prima facie</u> case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." <u>James</u>, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the

-11-

ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination.  See id.; Connell, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in James, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove -- particularly discrimination."  233 F.3d at 157; see Lapsley v. Columbia Univ., 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of McDonnell Douglas test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); see also Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases.  In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### b.  **Application**

As an initial matter, AEB challenges whether Borrero has made a prima facie case of sex discrimination because "many of plaintiff's cited instances of discrimination are too trivial to be actionable."  (Def. Mem. at 22).  I agree that such allegations as public criticism, overbearing scrutiny, and other less than civil behavior on the part of Circle do not rise to the level of a materially adverse action as required by Title VII.

-12-

See <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998) (Title VII does not set forth "a general civility code for the American workplace"); <u>Fridia v. Henderson</u>, No. 99 Civ. 10749 (BSJ), 2000 WL 1772779, at *6 (S.D.N.Y. Nov. 30, 2000) ("not every unpleasant matter [including a supervisor's 'nasty' treatment] creates a cause of action").  Although these claims are not actionable in and of themselves, other claims, such as unequal pay, are materially adverse employment actions and, thus, actionable.  Moreover, even if some of Borrero's allegations of disparate treatment are not actionable, they may nonetheless constitute evidence of discrimination in the terms and condition of her employment.  For example, even if unfair public criticism and overbearing scrutiny by themselves are not actionable, they may still show that other more materially adverse actions were motivated by gender.

Hence, Borrero has made a <u>prima facie</u> case of wage discrimination required by <u>McDonnell Douglas</u>, and AEB has met its burden of articulating non-discriminatory reasons for its employment actions and decision, as it has offered non-discriminatory explanations for its employment decisions.  (<u>See</u> Def. Mem. at 23-24).  Accordingly, I proceed to the ultimate question of whether Borrero has presented sufficient evidence from which a reasonable jury could find that she was discriminated against because of gender, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." <u>Stern v.</u>

<u>Trs. of Columbia Univ.</u>, 131 F.3d 305, 314 (2d Cir. 1997); <u>see also</u> <u>Siano v. Haber</u>, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), <u>aff'd mem.</u>, 201 F.3d 432 (2d Cir. 1999).

Examining the record as a whole, and resolving all conflicts in evidence and drawing all reasonable inferences in Borrero's favor, I conclude that several issues of material fact remain that warrant a trial and render summary judgment on the Title VII claims inappropriate. For instance, there is a genuine issue of fact as to whether gender played a role in Circle's decision not to credit Borrero for the revenue generated from the International Payments account, especially because Glenn was so credited when he was responsible for the account. Particularly questionable is that AEB does not present any evidence explaining or justifying its decision not to count revenue from the account when it was in Borrero's portfolio. There is also an issue of fact whether Circle's refusal to allow Borrero to attend a midtown meeting and his accompanying comment that "this is not a social club" were motivated by gender, in light of the fact that on the same day, he permitted McGuinness to attend a baseball game. While this comment, by itself, probably would not be actionable, it still arguably sheds light on more substantive claims. Because a reasonable jury could conclude from this and other evidence in the record that Borrero was discriminated against in the terms and conditions of her employment because of her gender, summary judgment on her Title VII claims is denied.

### 3. **EPA Claim**

#### a. **Applicable Law**

Both the EPA and Title VII provide remedies to victims of gender-based wage discrimination, but as the Supreme Court recognized, "the EPA and Title VII are not the same." Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162, 2176 (2007). For instance, the EPA is broader in that it has a longer statute of limitations period than Title VII, compare 29 U.S.C. § 255(a), with 42 U.S.C. § 2000e-5(e)(1), and does not require proof of intentional discrimination, Ledbetter at 2176.

But the EPA is narrower in scope than Title VII because "the [EPA] is restricted to cases involving 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" County of Washington v. Gunther, 452 U.S. 161, 168 (1981); see also 2 Merrick T. Rossein, Employment Discrimination: Law and Litigation § 26:1 (2007 ed.) ("The EPA is narrower and more technical in its prohibitions than Title VII."). In other words, a plaintiff must show that at least one person of the opposite sex receives unequal wages for equal work. If the unequal pay is a result of unequal work, a plaintiff does not have an EPA claim even if the unequal work is the result of discrimination, though she may have a Title VII claim. See Smith v. City of Jackson, Miss., 544 U.S. 228, 239 n.11 (2005) (noting that Congress intended to prohibit disparate impact claims under the EPA); see also Gunther, 452 U.S. at 178-79 (declining to

extend EPA's "equal work standard" to Title VII unequal pay claims because Title VII's "broad approach to the definition of equal employment opportunity is essential to overcoming and undoing the effect of discrimination").

Once a plaintiff makes out a _prima_ _facie_ case showing (1) the employer paid different wages to employees of the opposite sex, (2) the employees performed equal work on jobs requiring equal skill, effort, and responsibility, and (3) the jobs were performed under similar working conditions, _Belfi v._ _Prendergast_, 191 F.3d 129, 135 (2d Cir. 1999), the burden of persuasion shifts to the employer to prove that the wage disparity was justified by one of the four affirmative defenses provided under the EPA: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. 206(d)(1). Following such proof, the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons defendant seeks to advance are actually a pretext for sex discrimination. _Belfi_, 191 F.3d at 136.

### b. **Application**

To meet the statutory "equal work" requirement, Borrero argues that "despite being hired at different Band levels," she, Glenn, Gomez, Savage, and McGuinness "sold [foreign exchange] products to various categories of clients." (Pl. Mem. at 19). To demonstrate "equal work," a plaintiff "need not prove that her

job is identical to a higher-paid position, but only must demonstrate that the two positions are substantially equal." Lambert v. Genesee Hosp., 10 F.3d 46, 56 (2d Cir. 1993) (internal quotations omitted).

Although it is doubtful that Borrero's work was equal to the work performed by all the comparators named in her complaint, there is, at a minimum, an issue of fact whether Borrero and Glenn performed equal work. Although AEB argues that unlike Borrero, Glenn was responsible for a new business that required "significantly more effort than stepping into a support role in an already-established business" (Def. 56.1 ¶ 47), Borrero contends that some of her projects, such as persuading Latin American financial institutions to resume business with the Bank, required similar efforts (Borrero Aff. ¶¶ 4-5). A reasonable jury may find that selling a new product is substantially equal in effort to selling existing products to new clients.

Assuming that Borrero and Glenn performed equal work, there are additional issues of fact whether the wage disparity was justified. AEB submits that all four of the statutorily prescribed defenses apply, but a reasonable jury may find that AEB did not "systematically administer[] its plans for a merit system." Ryduchowski v. Port Authority of New York and New Jersey, 203 F.3d 135, 143 (2d Cir. 2000). For instance, Glenn's high performance ratings in 2002 -- for which AEB rewarded him with 900 RSAs -- appear generous when compared to Borrero's greater sales performance but lower performance rating, which

-17-

resulted in her receiving no RSAs.  (See Def. 56.1 ¶ 55).
Moreover, some of the factors cited for his high performance
rating were subjective.  (See, e.g., Def. 56.1 ¶ 57 (Glenn
received a favorable performance rating because he was charged
with "building a business from the ground up," and "FMS knew that
[this,] particularly in the wake of the September 11th attack,
would take time and much encouragement.")).  In light of the
issues of fact, summary judgment on Borrero's EPA claim is
denied.

## C.   Retaliation Claim

### 1.   Applicable Law

In addition to its anti-discrimination provision, Title
VII also includes an anti-retaliation provision, which forbids an
employer from firing an employee "because [s]he has opposed any
practice made an unlawful employment practice by [Title VII]."
42 U.S.C. § 2000e-3(a).  Further, "Title VII is violated when 'a
retaliatory motive plays a part in adverse employment actions
toward an employee, whether or not it was the sole cause.'" Terry
v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003) (internal
citations omitted).

To establish a prima facie case of retaliatory
discharge, a plaintiff must show that (1) she was engaged in
protected activity; (2) the defendant was aware of that activity;
(3) plaintiff suffered an adverse employment action; and (4)
there was a causal connection between the protected activity and
the termination or suspension.  Id.; see Nakis v. Potter, 422 F.

Supp. 2d 398, 418 (S.D.N.Y. 2006).  A plaintiff may present proof

of causation either "(1) indirectly, by showing that the

protected activity was followed closely by discriminatory

treatment, or . . . (2) directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant."  Gordon

v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); see

also Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.

1993).

        Although the burden that a plaintiff must meet at the

prima facie stage is de minimis, she must at least proffer

competent evidence of circumstances that would be sufficient to

permit a rational finder of fact to infer a discriminatory

motive.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d

Cir. 1995).

    **2.  Application**

        The only issue in Borrero's retaliation claim is the

third element of the prima facie case:  whether she suffered

adverse employment action.  The Supreme Court has recently

clarified the meaning of adverse action in Title VII retaliation

cases in Burlington Northern & Santa Fe Railway Co. v. White, 126

S. Ct. 2405 (2006).  It held that "the anti-retaliation provision

[of Title VII], unlike [Title VII's] substantive provision, is

not limited to discriminatory actions that affect the terms and

conditions of employment."  Id. at 2412-13.  Rather, to prevail

on a claim for retaliation under Title VII, "a plaintiff must

show that a reasonable employee would have found the challenged

action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal quotation marks omitted). The Supreme Court, by referring to a "reasonable employee," held that the "standard for judging harm must be objective." Id.

Under this standard, issues of fact exist in this case as to whether a reasonable person would find the alleged retaliatory acts materially adverse. Borrero claims that Circle retaliated by denying her travel request to Peru, excluding her from client meetings, cancelling her Bloomberg account, and giving her negative performance ratings. A reasonable jury could find that some or all of these alleged acts constitute materially adverse employment action. Denial of a request to take a business trip or exclusion from client meetings may make little difference to some workers, but may matter enormously in a business where compensation is tied to an individual employee's sales revenue, which, in turn, may depend on direct interaction with clients. A jury could also find that being cut off from Bloomberg -- "a vital source of information and communication with . . . clients" -- to be a materially adverse action. (Palmieri Ex. 19).

Borrero also makes a constructive discharge claim to show adverse employment action. The Supreme Court has held that a constructive discharge is "functionally the same as an actual termination" and is, thus, considered an adverse employment

action under Title VII.  Pennsylvania State Police v. Suders, 542 U.S. 129, 148 (2004).  An employee is constructively discharged when her employer, rather than discharging her directly, "intentionally creates a work atmosphere so intolerable that [s]he is forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003).  Whether conditions are so unendurable such that a resignation amounts to a constructive discharge is determined according to an objective standard; working conditions are intolerable when, "viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id. (internal quotations omitted).

Borrero asserts that by April 2005, a number of factors compelled her to resign:  (1) Marikit Salcedo informed her that she would be fired thirty days after the conclusion of her PIP; (2) Circle scheduled meetings with her clients without her knowledge; (3) Circle cancelled her Bloomberg account; (4) and Circle was singing "it's the final countdown" and "seven days, seven days" on March 28, 2005, seven days before the end of her PIP.  These assertions suggest that Circle may have considered the termination of her employment a foregone conclusion.  The Second Circuit has held that telling an employee she would be fired following probation, "no matter what [s]he did to improve [her] allegedly deficient performance," was sufficient alone to support a finding of constructive discharge.  Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987).  Borrero

likewise asserts that at the end of her PIP, AEB intended to discharge her, and she has adduced sufficient evidence to raise a genuine issue of fact as to whether a reasonable person in her position might have inferred from the circumstances that her supervisor was anticipating firing her, thereby compelling her to leave.

Although AEB offers several nondiscriminatory reasons for the alleged retaliatory acts, issues of fact nonetheless remain, which preclude summary judgment. For example, AEB justifies Circle's denial of Borrero's travel request to Peru as a business decision (see Def. Mem. at 23), but Borrero asserts that the Financial Institutions Group regarded Peru as a "profitable opportunity" and was "surprised and unhappy" that Borrero would not be making a trip to Peru. (Pl. Mem. at 16, citing Palmieri Aff., Ex. 17). The parties also disagree about who cancelled Borrero's Bloomberg account; AEB claims that it was a mistake on the part of Bloomberg, while Borrero claims that someone from the Bank had authorized the cancellation. (Pl. Mem. at 17). Also at issue is why Circle sang "seven days, seven days" a week before the conclusion of Borrero's PIP. Circle contends that he was referring to an upcoming deal (Circle Dep. at 214-15), while Borrero claims that he was singing about the end of her PIP and employment. These are issues of material fact, which render summary judgment inappropriate. Accordingly, AEB's motion for summary judgment dismissing plaintiff's retaliation claim is denied.

## E. State Law Claims

For the reasons stated above, summary judgment as to Borrero's claims under the State and City Human Rights Laws is denied. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000) (identical standards apply to employment discrimination claims brought under Title VII, State HRL, and City HRL). For the reasons set forth above, summary judgment on Borrero's claim under the State EPL is also denied. See Drury v. Waterfront Media, Inc., No. 05 Civ. 10646 (JSR), 2007 WL 737486, *2 n.1 (S.D.N.Y. Mar. 8, 2007).

## CONCLUSION

AEB's motion for summary judgment is granted in part and denied in part. It is granted with respect to Borrero's Title VII claims that occurred before May 12, 2004. It is denied with respect to all other claims. A pretrial conference will be held on February 15, 2008, at 10:30 a.m. at 500 Pearl Street, New York, New York 10007, Courtroom 11A.

SO ORDERED.

Dated: New York, New York
February 5, 2008

DENNY CHIN
United States District Judge

-23-